# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

MAINE MARITIME ACADEMY, )
)
        Plaintiff, )
)
v. )  Docket No. 1:17-cv-195-NT
)
JANIS FITCH, )
)
        AND )
)
SODEXO OPERATIONS LLC, )
)
        Defendants. )
)
)
JANIS FITCH, )
)
        Third-Party Plaintiff, )
)
v. )
)
UNITED STATES OF AMERICA, )
)
        Third-Party Defendant. )

## ORDER ON MAINE MARITIME ACADEMY'S MOTION TO DISMISS

This dispute arises out of injuries suffered by Defendant and Third-Party Plaintiff Janis Fitch while working aboard the Training Ship *STATE OF MAINE* (the "**Training Ship**"). Before me is Plaintiff Maine Maritime Academy's ("**MMA**") motion to dismiss Fitch's Amended Counterclaim (ECF No. 58). For the reasons that follow, I **DENY** MMA's motion.

## PROCEDURAL HISTORY

MMA filed a complaint seeking a declaration, pursuant to 28 U.S.C. § 2201, that it is not obligated to pay "maintenance and cure"[1] to Fitch, and, alternatively, a declaration that Sodexo[2] is obligated to indemnify MMA for any liability for Fitch's injury. Fitch answered MMA's complaint, and filed a counterclaim against MMA and a crossclaim against Sodexo for Jones Act negligence, unseaworthiness, and maintenance and cure. (ECF No. 14.) Sodexo filed a crossclaim against MMA. (ECF No. 18.) Fitch then amended her crossclaim and counterclaim to add a third-party claim against the United States. (ECF No. 51.) MMA filed the instant motion to dismiss Fitch's counterclaim for lack of subject matter jurisdiction or, alternatively, for failure to state a claim, as well as for judgment on the pleadings. (ECF No. 58.) Both Fitch and the United States filed a response in opposition to MMA's motion. (ECF Nos. 63, 75.) MMA filed a consolidated reply. (ECF No. 79.)

On September 4, 2018, I held a telephone conference of parties. The parties agreed that it made sense to address first the issue of whether I have subject matter jurisdiction over Fitch's counterclaims against MMA.[3] I allowed the parties to conduct

---

[1] "Maintenance and cure are the unique obligations that ship owners owe sailors who fall ill or become injured while in the service of a ship. Neither fault nor causation is required." *Whitman v. Miles*, 294 F. Supp. 2d 117, 121 (D. Me. 2003), *aff'd*, 387 F.3d 68 (1st Cir. 2004).

[2] Sodexo provides food services for MMA, both on-campus and aboard the Training Ship. Sodexo was Fitch's immediate employer. Compl. ¶¶ 7, 10 (ECF No. 1).

[3] The impact of considering this as a question of jurisdiction, *see, e.g., Ali v. Rogers*, 780 F.3d 1229, 1236-37 (9th Cir. 2015), as opposed to a question of whether the plaintiff has failed to state a claim, *see, e.g., Daniels v. United States*, No.:3:16-CV-02077-BTM-DHB, 2017 WL 3478765 (S.D. Cal. Aug. 11, 2017), affects the assignment of the burden of proof, the legal standard, and the materials that are available for a court to review. Here, the parties agreed that I should resolve the question under Rule 12(b)(1) and that I could consider materials outside the pleadings to do so.

limited additional discovery and submit supplemental briefing on the jurisdictional issue. (ECF Nos. 84, 86, 87, 88.)[4]

## FACTUAL BACKGROUND

Congress has declared its objective to have a robust and capable merchant marine to meet the nation's domestic and foreign commerce needs and to serve as a naval and military auxiliary in time of war or national emergency. 46 U.S.C. § 50101(a). It has further declared that: "[i]t is the policy of the United States to encourage and aid the development and maintenance of a merchant marine [to] satisfy[] [those objectives]." 46 U.S.C. § 50101(b). In order to ensure that there are adequate human resources to achieve its goals, Congress has enacted legislation focused on the education and training of merchant mariners.

> It is the policy of the United States that merchant marine vessels of the United States should be operated by highly trained and efficient citizens of the United States and that the United States Navy and the merchant marine of the United States should work closely together to promote the maximum integration of the total seapower forces of the United States.

46 U.S.C. § 51101. To that end, the Secretary of Transportation maintains the United States Merchant Marine Academy and "cooperate[s] with and assist[s] State maritime academies in providing instruction to individuals to prepare them for service in the merchant marine of the United States." 46 U.S.C. §§ 51301, 51501(a).

---

[4]    MMA filed a motion to strike exhibits attached to the responses of Fitch and the United States. (ECF No. 78.) Following supplemental briefing, MMA narrowed its motion to strike to only statements made in depositions that "constitute conclusions of pure law." MMA's Suppl. Submission (ECF No. 87) 4 n.2. Because I do not rely on these statements in ruling on the motion to dismiss, the motion to strike is moot.

In support of state maritime academies, the Maritime Administration ("**MARAD**"), an agency within the Department of Transportation, provides direct payments, tuition assistance, and assistance with instruction and course development. 46 U.S.C. §§ 51501-51511. In addition, the Secretary of Transportation is authorized to provide vessels to state maritime academies for use as training ships and to provide limited fuel assistance. 46 U.S.C. § 51504. Training ships provided by MARAD remain the property of the United States Government. 46 U.S.C. § 51504.

To qualify for a training vessel, state maritime academies must provide specific courses, meet standards set in consultation with the Secretary of the Transportation, and require students in a merchant marine officer preparation program to pass various licensing tests. 46 U.S.C. § 51506(a). One regulation governing curriculum requires that the "minimum period of training shall be three (3) years," and further states that "[f]or the Cadets and Midshipmen[5] . . . at least six (6) months of the total time must be aboard a Training Ship in cruise status." 46 C.F.R. § 310.3(c)(1).

MMA is a one of six federally recognized state maritime academies, and it qualifies for a training vessel. Memorandum of Agreement Between the United States of America and Maine Maritime Academy 1 ("**MoA**") (ECF No. 63-1); O'Donnell Dep. 11 (ECF No. 84-1). MMA offers Bachelor of Science degrees in marine transportation, marine systems engineering, marine engineering technology, marine engineering

---

[5]     "Cadets" are "enrolled in the United States Maritime Service and in good standing at . . . [a qualifying] maritime academy." 46 C.F.R. § 310.1(g). "Midshipman means a student in good standing at a State maritime academy or college who has accepted midshipman status in the United States Naval Reserve (including the Merchant Marine Reserve, United States Naval Reserve)." 46 C.F.R. § 310.1(l).

operations, power engineering, vessel operations and technology, international business and logistics, oceanography and ocean studies. Approximately two-thirds of the student body at MMA are cadets enrolled in a merchant marine officer preparation program and working to obtain merchant seamen licenses that are issued by the United States Coast Guard. The remaining students are not cadets but they may be pursuing careers that support the merchant marine.[6]

MMA offers cadets opportunities to complete the required six months of training at sea. One of the ways cadets can accrue the required sea-time training is by participating in MMA's annual summer training cruises aboard the Training Ship. MMA charges students between $1,800 - $7,500 (depending on the student's major) to participate in a summer cruise. https://mainemaritime.edu/undergraduate-catalog/affording-mma/tuition-and-fees/ (last visited Feb. 15, 2019).[7] Although the Training Ship largely supports programs for cadets, non-cadets use the Training Ship from time to time to support their own studies. This incidental use is governed by the MoA, which provides that "[a]ny [ancillary] use of the Vessel shall not compete with or impede training" and that any ancillary use during a training cruise must be submitted to MARAD for approval. MoA 13.

This case arises from injuries sustained by Fitch during a summer cruise. Fitch, the lead cook aboard the Training Ship, contends that she was seriously injured

---

[6]     At oral argument, MMA's attorney proffered the above undisputed facts. *See* Procedural Order (ECF No. 98) (notice of topics for oral argument).

[7]     The Government cited materials on MMA's website in its Response to MMA's motion to dismiss. *See* Gov't.'s Resp. 3-6 (ECF No. 75). In its Reply (ECF No. 79), MMA did not dispute the accuracy of the material.

in July of 2016, when she "slipped, fell and slid across the deck . . . shattering her left tibia and left fibula" while preparing breakfast in the galley. First Amend. Compl. ("**FAC**") ¶ 29 (ECF No. 51). Fitch alleges that she slipped because an inadequate drainage system was unable to dispose of greasy, soapy wash water from the previous night's cleaning. FAC ¶¶ 30-31.

## LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," restricted to hear matters "authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994). Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint on the grounds that the court lacks subject matter jurisdiction. MMA contends that Fitch lacks jurisdiction to pursue a counterclaim against it because, by statute, Fitch's exclusive remedy lies against the United States. A district court may "resolv[e] . . . factual disputes between the parties" "in order to determine its own jurisdiction." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

## DISCUSSION

### I.     The Suits in Admiralty Act

The issue before me arises under the Suits in Admiralty Act (the "**SIAA**"). The SIAA, which waives the sovereign immunity of the United States for certain cases in admiralty, provides, in pertinent part: "in a case in which, if a vessel were privately owned or operated . . . a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought against the United States." 46 U.S.C.

§ 30903. Courts have determined that the SIAA authorizes suit against the United States in three situations:

> first where an injury is caused by a vessel owned by the United States; . . . second, where an injury is caused by a vessel operated by the United States; and finally, in cases where an injury is caused by a vessel operated for the United States. The language of the statute is disjunctive; therefore the fulfillment of any one of the above three conditions will satisfy the requirements of the Act.

*Bowman v. Pan American World Services, Inc.*, 704 F. Supp. 695, 696 (E.D. La. 1989).

At issue in this case is the SIAA's "exclusivity provision," which provides that a plaintiff who can sue the United States under the SIAA cannot also bring an "action arising out of the same subject matter against the officer, employee, or agent of the United States." 46 U.S.C. § 30904.

## II.    The Arguments Advanced

The central question before me is whether MMA is an agent of the United States for purposes of the SIAA's exclusivity provision. MMA argues that it is an agent of the United States, as a matter of law, because the United States owns the Training Ship. It further contends that it qualifies as an agent because the United States "retains overall direction and control of the vessel" for the purpose of training officers in the merchant marine of the United States. Mot. to Dismiss 6-8; MMA's Reply 8-10 (ECF No. 79).

The United States and Fitch counter that government ownership of the Training Ship is not enough, in and of itself, to make MMA an agent as a matter of law. They further contend that MMA is not an agent of the United States because: (1) MARAD did not consent for MMA to act as its agent; (2) MARAD did not exercise

sufficient control over MMA's operation of the Training Ship, and (3) MMA uses the Training Ship for its sole benefit. Gov't.'s Resp. 8, 13 (ECF No. 75); Fitch's Obj. 7 (ECF No. 63).

III.    **Whether MMA is an Agent as a Matter of Law because the Training Ship is a Public Vessel**

For its first contention—that it is an agent as a matter of law simply because the Training Ship is a public vessel owned by the United States—MMA relies on the First Circuit's language in *Ironshore Specialty Insurance Co. v. United States*, which held that "contractors crewing a ship deemed a 'public vessel' for purposes of the [Oil Pollution Act] are—as a matter of legal definition—agents of the United States for purposes of the Suits in Admiralty Act's exclusivity provision." 871 F.3d 131, 141 (1st Cir. 2017). The United States counters that "the mere fact of government ownership of a 'public vessel' and the fact that another entity operates the vessel, does not provide a sufficient basis for determining that the entity is an 'agent' within the meaning of the [SIAA]." Gov't.'s Resp. 17.

The United States concedes that the Training Ship "is owned by the United States through MARAD, and is a public vessel of the United States under the PVA." Gov't.'s Resp. 10. At oral argument, the United States explained that this concession is not fatal under *Ironshore* because *Ironshore* cannot and should not be extended to cases in which the Government owns a vessel but does not operate it (either by itself or through an agent).[8]

---

[8]     Counsel for the Government explained that there are several categories of public vessels: 1) vessels owned and operated by the United States, for example a naval ship operated by naval personnel; 2) vessels owned by the United States but operated by a contractor under the operational

*Ironshore* involved a military transport vessel called the *FISHER*, which spilled 11,000 gallons of fuel next to Boston Harbor triggering an expensive cleanup operation. Ironshore Specialty Insurance Company ("**Ironshore**") ended up paying for the cleanup, and it sought to recover the cleanup costs in an action against the United States and American Overseas Marine Company, LLC ("**AMSEA**"), the contractor that operated the *FISHER*. Ironshore brought claims arising under the Oil Pollution Act ("**OPA**") and general admiralty and maritime claims sounding in negligence against both the United States and AMSEA. The First Circuit addressed the OPA claims first, noting that the OPA, which imposes strict liability for pollution removal costs on the party responsible for the vessel, contains an exception for discharges from a "public vessel," which is defined under the OPA as "a vessel owned or bareboat chartered and operated by the United States[] . . . except when the vessel is engaged in commerce." *Ironshore*, 871 F.3d at 136 (quoting 33 U.S.C. § 2701(29)). The First Circuit wrote: "[a]lthough the OPA states that vessels 'owned and . . . operated by the United States' are public vessels, the statute provides no definition of the word 'operated.'" *Id*. at 137.[9]

---

control of the United States, as was the case of the vessel in *Ironshore*; 3) vessels not owned by the United States but operated by the United States or a contractor acting on its behalf, as in the case of *Favorite v. Marine Personnel and Provisioning, Inc.*, 955 F.2d 382 (5th Cir. 1992); and 4) vessels owned by the United States but not operated by or for the United States. The Government contends that the fourth category is a limited one and that all Government-owned training ships loaned to state maritime academies belong in this category.

[9]     By quoting the OPA in this fashion, the First Circuit has clearly signaled that the definition of public vessel in the OPA requires both ownership and operation.

The First Circuit, in determining that the *FISHER* was a public vessel exempt from the OPA, looked to the Public Vessels Act[10] and cases interpreting it and held that

> if a vessel functioning in a public capacity is owned (or bareboat chartered) by the United States, but crewed by a private contractor, such a vessel constitutes a "public vessel" *so long as the private contractor is acting under the operational control of the United States* and except when the vessel is engaged in commerce.

*Id.* at 138 (footnote omitted) (emphasis added). The vessel in *Ironshore* was "deployed principally to carry military vehicles and containerized cargo for the Department of Defense," and the contract between the Department of Defense and AMSEA "clearly established that at all times the [vessel] would be controlled by the U.S. military." *Id.* at 134, 138. The First Circuit concluded that because AMSEA was acting under the operational control of the United States, the *FISHER* was a public vessel exempt from the OPA.

After addressing the OPA claims, the First Circuit went on to address the general admiralty and maritime claims sounding in negligence. After concluding that the negligence claims against the United States survived, it addressed whether AMSEA could benefit from the exclusivity provision of the SIAA. Ironshore argued that AMSEA was not an agent of the United States because it was "acting entirely on its own behalf." *Id.* at 140. The First Circuit disagreed, again turning to the PVA:

> In cases filed pursuant to the Public Vessels Act, other circuits have held that a private contractor crewing a ship that qualifies as a public vessel

---

[10]  The Public Vessels Act (PVA), is a piece of companion legislation enacted shortly after the SIAA. It serves to waive the sovereign immunity of the United States for "damages caused by a public vessel of the United States." 46 U.S.C. § 31102. All claims under the PVA are "subject to the SIAA, including . . . its exclusivity provision." *Ali v. Rogers*, 780 F.3d at 1234.

is necessarily an "agent of the United States" for purposes of the Suits in Admiralty Act's exclusivity provision. *See Favorite Marine v. Marine Pers. & Provisioning, Inc.*, 955 F.2d 382, 388 (5th Cir. 1992) ("As a matter of legal definition, 'agent' of the United States is an appropriate characterization of such a contract operator of a public vessel." (quoting *Petition of the United States*, 367 F.2d 505, 509-10 (3d Cir. 1966))); *see also id.* ("[T]he general statement of an agency concept . . . include[s] any instrumentality through and by which the public vessels are operated." (quoting *Petition of the United States*, 367 F.2d at 510) (second alteration in original)). Having already decided that the concept of a "public vessel" has the same meaning under the OPA and the Public Vessels Act . . . , we conclude that contractors crewing a ship deemed a "public vessel" for purposes of the OPA are—as a matter of legal definition—agents of the United States for purposes of the Suits in Admiralty Act's exclusivity provision.

*Id.* at 140-41.

*Ironshore* must be read in the specific context of the OPA definition of public vessel: "a vessel owned . . . and operated by the United States." 33 U.S.C. § 2701(29). The United States argues that in situations where the government loans a vessel and does not thereafter control the operation of that vessel, *Ironshore* does not apply. I agree with the United States that the First Circuit would not likely extend *Ironshore's* statement on SIAA agency to vessels owned by the Government but operated by an entity that was not under the operational control of the government, because such a holding would not comport with the common law understanding of agency. *See infra* IV. Since the operational control inquiry overlaps with the agency question, I go on to analyze whether there is an agency relationship here.

## IV.    Whether MMA is MARAD's Agent

### A.    Caselaw Interpreting "Agent" Under the SIAA

The SIAA does not define the term "agent," but courts generally apply the common law definition of agency.[11] *Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 997 (9th Cir. 1997). The Third Circuit determined that an independent contractor could be an agent of the United States, if "he is employed as a fiduciary, acting for a principal with the principal's consent and subject to the principal's overall control and direction in accomplishing some matter undertaken on the principal's behalf." *Petition of the United States*, 367 F.2d at 509, (citing Restatement (Second) of Agency); *see also Dearborn*, 113 F.3d at 997; *Servis v. Hiller Systems*, 54 F.3d 203, 207 (4th Cir. 1995).

To establish agency, "two factors must be present: 1) 'the principal must exercise significant control over the agent's activities,' and 2) 'the agent must be engaged in conducting the business of the principal.' " *Daniels v. United States*, No.:3:16-CV-02077-BTM-DHB, 2017 WL 3478765, *5 (S.D. Cal. Aug. 11, 2017) (quoting *Cannon v. Austal USA, LLC,* No. 15-CV-2582-CAB (BLM), 2016 WL 4916966, at *3 (S.D. Cal. Apr. 11, 2016)).[12]   In addition to these two factors, there

---

[11]    Under the common law, "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006).

[12]    *See also Petition of the United States*, 367 F.2d 505, 509-10 (3d Cir. 1966) (contractor expressly agreed to conduct the business of the government); *Landry v. United States*, 20 F.3d 469, 1994 WL 122188 at *5-6 (5th Cir. Mar. 29, 1994) (contractor was acting on behalf of the government); *Favorite v. Marine Personnel and Provisioning, Inc.*, 955 F.2d 382 (5th Cir. 1992) (same); *Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 997-98 (9th Cir. 1997) (inquiry is whether there is "significant control

must be some "manifestation of consent" between the parties that the agent should act on behalf of the principal. *Id.* at *6. In determining whether an agency arrangement exists, words such as "employer, agent, independent contractor, etc., however, are not decisive. The court must look at the venture as a whole." *Nelsen v. Research Corp. of the Univ. of Haw.,* 805 F. Supp. 837, 846 (D. Haw. 1992) (citation omitted).

The vast majority of cases interpreting the exclusivity provision of the SIAA involve fact patterns in which the United States owns or bareboat charters a vessel and contracts with a private entity to perform a specific task on behalf of the government. *See Dearborn,* 113 F.3d at 998 ("[Contractor] consented to operate the [vessel] on the government's behalf" under a contract that provided "[t]he Contractor shall provide personnel, operational and technical support ashore and afloat, equipment, tools, provisions, and supplies to operate and maintain ten U.S. Naval Ships."); *Favorite,* 955 F.2d at 387 (Contract between government and contractor provided that "[t]he Contractor . . . shall provide personnel, operational and technical support ashore and afloat, equipment, tools, provisions and supplies, spare parts, consumables, etc. to operate and maintain tankers *for the Commander, Military Sealift Command (COMSC).* Nine tankers are operated for the purpose of moving Department of Defense refined petroleum products worldwide."); *Petition of the United States,* 367 F.2d at 508 ("The agreement provided that [contractor] would

over the [operator's] activities—either day-to-day control or overall control and direction of the mission.").

'manage and conduct the business of the Government with respect to' the tanker and, to that end, would 'equip, fuel, supply, maintain, man, victual, and navigate' the ship."); *Smith v. United States*, 346 F.2d 449, 451 (4th Cir. 1965) (contractor was agent of United States where contract provided "[t]he Contractor undertakes and promises to manage and conduct the business of the Government with respect to such tankers," including "[t]he Contractor shall equip, fuel, supply, maintain, man, victual and navigate the tankers" and "procure all personnel necessary to fill the complement of each tanker subject to the limitations listed below"); *Bowman*, 704 F. Supp. at 697 (contractor and subcontractor were agents of United States, where contract was "responsible for the operation, maintenance, servicing and repair of all property assigned for use by the United States through NASA," and the subcontractor "operate[d] the nine cryogenics barges for NASA's rocket engine testing program").[13]

There are no cases that address whether state maritime academies operating a training ship owned by the United States are agents of the United States. *See*

---

[13]     Citing *Dearborn*, *Favorite*, and *Petition of the United States*, MMA urges me to adopt a broader definition of "agent" under the SIAA that includes "any instrumentality through and by which public vessels are operated." MMA Reply at 3 (ECF No. 79). This language is taken from *Petition of the United States*, where the court faced and rejected an argument that an "independent contractor" as distinguished from a "servant" could not be an agent. *Petition of the United States,* 367 F.2d at 509 ("[A]n independent contractor, no less than a servant may be an agent in that he is employed as a fiduciary, acting for a principal with the principal's consent and subject to the principal's overall control and direction in accomplishing some matter undertaken on the principal's behalf."); *see also Dearborn*, 113 F.3d at 997 n.3 (recognizing that "agent" under SIAA can include independent contractor, notwithstanding that those terms are mutually exclusive in other contexts). The distinction between an independent contractor and a servant is not at issue in this case. The exclusivity provision itself applies to an "officer, employee, or agent of the United States" and does not include the term "any instrumentality." 46 U.S.C. § 30904. And the cases that use the term "any instrumentality" actually analyze "agent" status under the common law test. I reject MMA's invitation to consider any instrumentality that operates a public vessel an agent. Such an interpretation is at odds with the plain meaning of the exclusivity provision and is unsupported by the caselaw.

Gov't.'s Resp. 13. *Nelsen v. Research Co. of the University of Hawaii,* involved the use of a vessel (the *KILA*) by a corporation (RCUH) conducting marine research for the University of Hawaii. 805 F. Supp. 837. There, the District Court concluded that RCUH was not acting as an agent of the Government for purposes of the SIAA, basing its conclusion on the agreement between RCUH and the United States and the venture as a whole. The *Nelsen* court wrote:

> the agreement between the United States and RCUH required RCUH to maintain the KILA in good repair, maintain liability insurance on the vessel and hold the United States harmless from third party claims. The government did not consent to allow RCUH to act on its behalf. The KILA was not operated for the United States or subject to its control. No one outside of the University of Hawaii ever gave directions or orders concerning either the day-to-day or overall operation, maintenance, or manning of the KILA. If anyone wished to use the vessel, they had to get permission from RCUH, not the United States.

*Id.* at 847-48.

## B. The Question of Consent

I look to the Agreement between MARAD and MMA for evidence of the parties' consent to enter an agency relationship. Nowhere in the Agreement that was in effect at the time of Fitch's injuries is MMA identified as MARAD's agent. United States of America Department of Transportation Maritime Administration State Maritime Academy or College Agreement (ECF No. 102-1) (the "**Agreement**"). Under the Agreement, MARAD agrees to provide various types of support—assistance payments, student incentive payments, and fuel payments for the Training Ship—to MMA. In return, MMA agrees to provide certain courses, conform to certain standards in those courses, accept out-of-state students, comply with civil rights laws,

and make its books available for auditing. Agreement, Article 4. Article 7 of the Agreement provides that:

> [t]his Agreement is subject to all the provisions of Part 310, Subpart A, Title 46, Code of Federal Regulations, and the School hereby agrees to conform to said provisions as they may be amended from time-to-time during the period this Agreement is in effect.

Agreement, Article 7.

Section 310 of the Code of Federal Regulations, incorporated by reference into the Agreement, does not explicitly address whether MMA is or is not an agent of the United States. There are, however, some regulations that suggest the parties did not consent to enter an agency relationship. For example, Section 310.4 requires the following notice to be posted conspicuously aboard the Training Ship:

> This training ship is the property of the United States of America. . . . *Neither the State, the Commanding Officer, nor any other person has any right, power or authority to create, incur or permit to be imposed upon this vessel, any lien whatever.*

46 C.F.R. § 310.4(a)(5) (emphasis added). And although MMA is authorized to make repairs to the Training Ship when cruising, its power is strictly limited. *See* 46 C.F.R. § 310.4(e)(iv) (authorized to expend up to $5,000 for emergency repairs that become necessary while Training Ship is on foreign cruise without seeking prior approval of the United States). In addition, Section 310.9, titled "Medical attention and injury claims," provides: "[Officers and other personnel of the School, and of the Training Ship] who are not Federal employees shall look to the State alone for pay, allowances, compensation and other benefits during injury or illness." 46 C.F.R. § 310.9(c). The provision applies to Fitch's injury, and it would run afoul of the SIAA if the United States had intended MMA to act as its agent.

In addition to the Agreement in effect at the time of Fitch's injuries, the Government pointed to a document entitled "MARAD Office of Ship Operations Policy Guidance: Training Ship Custodial Care" (the "**Custodial Care Guide**"), which provides specific guidance for maintenance and operation of the Training Ship. (ECF No. 75-2.) In a section captioned "Training Vessel Owner and Operator," the Custodial Care Guide acknowledges that

> MARAD will be the documented Owner, and the SMA will be the documented Operator. Considering the complex nature of this relationship, MARAD and SMAs will cooperatively fulfill roles and responsibilities that modify the traditional relationships within the merchant services, and other publically owned vessels of the NDRF.[14]

Custodial Care Guide, Section 3. This is another indication that MARAD and MMA understood the unique nature of their arrangement and did not intend it to be an agency relationship.

Finally, the United States points to a Memorandum of Agreement ("**MoA**") entered into by MARAD and MMA on August 1, 2016, shortly after Fitch's injury, which includes a provision that the parties "agree that neither [the State of Maine nor MMA] shall be considered to be an agent of the United States for purposes of the . . . Suits in Admiralty Act." MoA 20. The MoA appears to make explicit what is implicit in the Agreement, regulations, and Custodial Care Guide, and it lends

---

[14]     Although NDRF is not defined in the Custodial Care Guide, it appears to be a reference to the National Defense Reserve Fleet. At oral argument, counsel for the Government represented that MARAD has massive fleets of reserve vessels most of which are operated exclusively by contract operators under contracts which leave no ambiguity that the operator is acting as an agent of the government and on its behalf. The arrangement between MARAD and MMA is without question different than the standard government-owned, contractor-operated arrangements that are present in the clear majority of the cases analyzing the exclusivity provision of the SIAA.

further support to the Government's claim that MARAD did not consent to have MMA act as its agent. The Government has provided an email string that shows MMA accepting the terms of the MoA before Fitch's injury. (ECF No. 86-2.) While the MoA is not the operative agreement, it does shed light on how the parties understood their relationship at the time of Fitch's injury.

MMA contends that the regulations support its claim that MARAD implicitly consented to have MMA act as its agents. I disagree. The Agreement is silent as to any agency arrangement and the express language of the regulations, particularly 310.9, undercuts any such implicit understanding. The Custodial Care Guide frankly acknowledges that a complex relationship exists between MARAD and state merchant marine academies that is different from a standard owner-operator arrangement with the government. I conclude that MARAD has not consented to having MMA act as its agent.

## C.      Whether MMA Acted on MARAD's Behalf

MMA contends that it was acting on behalf of the Government by doing the job of training young men and women to be members of the merchant marine. The Government and Fitch counter that this overall objective of the Government does not suffice to meet the requirement that an agent act on a principal's behalf.[15]

_____

[15]      Without providing authority, the Government twice mentions that MMA was not acting for the sole benefit of the United States and points out that MMA benefited from the use of the vessel. Gov't.'s Resp. 8 ("The ship was operated by Maine Maritime for its own purposes . . . and not for the sole benefit of the United States") and 16 ("Maine Maritime's annual training cruise is not solely for the direct benefit of the United States.") (ECF No. 75). That argument appears to be at odds with general principles of agency, which provide that a principal need not benefit from an agent's actions for the agent to have acted "on behalf of" the principal. Restatement (Third) of Agency § 1.01(g) (2006). I note but need not decide the question of whether an agent for purposes of the SIAA must use the vessel solely for the benefit of the government. *See Petition of the United States,* 367 F.2d at 509

The United States needs a robust and capable merchant marine. MARAD supports state maritime academies and provides training ships to help meet that need. In fact, the Notice that is required to be posted on all training ships states: "[This training ship] is furnished to the State of _____ by the Department of Transportation, Maritime Administration, for the purpose of training young men and women to become officers in the merchant marine of the United States." 46 C.F.R. § 310.4(a)(5).

It is also clear, however, that MMA gets significant benefit from being able to use the Training Ship. This 500-foot vessel provides a floating campus for its students. In addition to providing Cadets with a way to meet their sea-hour requirements, the vessel supports students who are not training to become officers in the merchant marine. And MMA separately charges students to participate in a summer cruise.

I come back to the fact that this is not the typical case where MARAD contracts with a private entity to do a specific job on behalf of the government. This is an arrangement where the interests of the Government and MMA align. While the United States has an overarching interest in the cultivation of a competent merchant marine, I believe that MMA goes too far in its contention that MMA, by operating the Training Ship, is doing the Government's business and acting on MARAD's behalf.

---

("[G]overnment ownership and use as directed by the government exclusively for a public purpose suffice without more to make a ship a public vessel."); *Blanco v. United States,* 775 F.2d 53, 59 (2d Cir. 1985) (public vessel includes vessel used solely in public service)).

### D. Whether MARAD Retained Overall Control and Direction of the Vessel

I turn next to MMA's argument that MARAD retained overall control and direction of the vessel while it was operated by MMA. Key factors supporting a finding of "overall control and direction" include whether the United States can dictate the "voyages and cargoes," can hire and fire the master and crew, and must reimburse the contractor for wages and operating costs. *Petition of the United States*, 367 F.2d at 509-510.

Section 310.4 of the Code of Federal Regulations, incorporated by reference in the Agreement between the parties, provides that the maritime academy shall have "complete use of a Training Ship" subject to the conditions that the maritime academy 1) return the vessel in the same condition as it was received when the use of the training ship is terminated; 2) get approval before removing any property from the ship, and 3) cooperate with MARAD inventories of the training ship. 46 C.F.R. § 310.4(c). Section 310.4 divides the responsibilities for maintenance and repair of the Training Ship between MARAD and MMA. 46 C.F.R. § 310.4(c). Section 310.4 also requires the maritime academy to submit its cruise itinerary for approval so that MARAD can arrange with the Department of State for clearance of the Training Ship in foreign ports. 46 C.F.R. § 310.4(f).

In practice, for the most part, MMA determines the voyages, hires the master and crew, and pays operational expenses. MARAD's approval of foreign ports of call selected by MMA and its recall authority over the Training Ship in a national emergency fall far short of general authority to dictate voyages. Although MMA may

be required in a national emergency to return the vessel, it cannot be forced to staff or operate the vessel during the emergency. O'Donnell Dep. 17-19. The decisionmakers aboard the Training Ship during the Training Cruise are MMA employees. *See Nelsen*, 805 F. Supp. at 847-48. The sole MARAD employee assigned to the Training Ship is the surveyor, whose authority is limited to maintaining the vessel. O'Donnell Dep. 20, 31-32, 62; Gandy Dep. 27-28 (ECF No. 63-2). The surveyor is not present on the vessel for the majority of the year, does not communicate regularly with senior leaders at MMA, and does not issue instructions or directives to crew members, even about maintenance issues. O'Donnell Dep. 37, 39-40. The surveyor inspects the Training Ship as it departs on a cruise to help ensure that no maintenance or repairs are needed but does not travel overseas on a cruise. O'Donnell Dep. 46-49; Custodial Care Guide 29. MARAD does provide some fuel assistance to MMA for operating the vessel, 46 U.S.C. § 51504(f), but there is no evidence that this support approaches reimbursement for "all costs of operating the ship." *Petition of the United States*, 367 F.2d at 510.

There is no question that there are some elements of control by MARAD over the operation of the Training Ship. The relationship between MARAD and state maritime academies is symbiotic. But given that the contract between the parties does not create an agency arrangement, given that the Government is not contracting with MMA to perform a specific task on its behalf but rather is supporting an overall shared educational objective, and given that MMA retains considerable control over the operation of the Training Ship, I conclude that this venture as a whole does not

support a finding that MMA is an agent for purposes of the SIAA.[16] Because I find

that MMA is not an agent of the United States under the SIAA, I conclude that I have

jurisdiction over Fitch's counterclaims against MMA.

## CONCLUSION

For the reasons stated above, the Court **DENIES** MMA's motion to dismiss.

MMA's motion to strike is moot.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 15th day of February, 2019.

---

[16]    MMA makes a half-hearted argument that MARAD also exercised day-to-day control over the Training Ship in its supplemental submission. *See* MMA's Suppl. Submission 3. Most of its briefing is devoted to its claim that MARAD retained overall direction and control of the Training Ship. MMA Mot. to Dismiss 8 (ECF No. 58) (quoting 46 CFR § 310.4). For the same reasons that I find no overall control, I find no direct day-to-day control by MARAD of the Training Ship.