## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| MAINE MARITIME ACADEMY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 1:17-cv-195-NT |
| | ) |
| JANIS FITCH, | ) |
| | ) |
| AND | ) |
| | ) |
| SODEXO OPERATIONS LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| JANIS FITCH, | ) |
| | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Third-Party Defendant. | ) |

## RULINGS ON SEAMAN STATUS AND IDENTITY OF EMPLOYER

Maine Maritime Academy ("**MMA**") initiated this action seeking a declaratory

judgment that it was not obligated to pay Janis Fitch maintenance and cure[1] for

injuries Ms. Fitch sustained while working in the galley of the Training Ship State of

---

[1] "The duty of maintenance and cure requires a ship's master to provide food, lodging, and medical services to a seaman injured while serving the ship. This duty, which arises from the contract of employment, does not rest upon negligence or culpability on the part of the owner or master, nor is it restricted to those cases where the seaman's employment is the cause of the injury or illness." *The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2279 (2019) (citations and quotation marks omitted). MMA has been paying Ms. Fitch maintenance and cure.

Maine ("**Training Ship**"). Ms. Fitch brought counterclaims against MMA, the operator of the Training Ship, and cross claims against Sodexo Operations LLC ("**Sodexo**"), the company which provides food services for MMA, for Jones Act negligence,[2] unseaworthiness,[3] and maintenance and cure. First Amended Counterclaim and Crossclaim (ECF No. 51).

On June 19–20, 2019, I held a bench trial to decide: (1) whether Ms. Fitch was a seaman under the Jones Act, 46 U.S.C. § 30104; (2) whether MMA or Sodexo was Ms. Fitch's Jones Act employer; and (3) whether 46 C.F.R. § 310.9 bars all of Ms. Fitch's claims against Sodexo. The parties completed post-trial briefing on July 19, 2019.[4] For the reasons set forth below, I find that Ms. Fitch is a seaman under the Jones Act and that Sodexo was her Jones Act employer.

## I.    Seaman Status under the Jones Act

### A.    General Legal Background

The Jones Act allows recovery by "[a] seaman injured in the course of employment . . . against the employer." 46 U.S.C. § 30104. Under the Jones Act,

> the essential requirements for seaman status are twofold. First, "an employee's duties must 'contribute to the function of the vessel or to the accomplishment of its mission.'" Second, a seaman must have a

---

[2]    Ms. Fitch also asserted a negligence claim against MMA under general maritime law. First Amended Counterclaim 5 (ECF No. 51).

[3]    At trial, Ms. Fitch dropped her unseaworthiness claim against Sodexo. Tr. vol. 1 9:5–7.

[4]    Ms. Fitch withdrew her objections to deposition designations. Fitch Post-Trial Br. 1 (ECF No. 169). MMA's objections to the deposition designations are overruled. MMA's Rule 411 objections are also overruled.

connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.

*Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995) (*quoting McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 355 (1991)) (alterations and ellipses omitted). The general guideline is that a maritime worker is a seaman if she works 30 percent of her time in service of a vessel or an identifiable group of vessels. *Chandris*, 515 U.S. at 371.

Ms. Fitch argues that she is a seaman entitled to recover under the Jones Act. MMA and Sodexo argue that Ms. Fitch was a land-based employee who did not spend enough time working on the Training Ship to qualify as a seaman. The focal point of the dispute is whether Ms. Fitch's connection to the Training Ship meets the substantial duration requirement of the *Chandris* test. Sodexo Post-Trial Br. 29 (ECF No. 167); MMA Post-Trial Br. 12 n.8 (ECF No. 168).

## B. Findings of Fact

Ms. Fitch was hired in 2008 as a cold prep cook by Omar Char, then Sodexo's general manager at MMA. Although she was hired primarily to cook at the MMA cafeteria on campus ("the Hill"), she was told by Mr. Char that she may be required to serve on board the Training Ship during summer cruises. Before she could serve on a cruise aboard the Training Ship, MMA required her to obtain a merchant mariner credential and a transportation worker identification credential and to undergo drug testing and a fitness evaluation. Ms. Fitch was unable to complete the necessary prerequisites in time to participate in the Training Ship's 2008 summer cruise, but she did complete them in time to join the 2009 summer cruise. She liked the Training Ship experience so much that she volunteered to go on every training

cruise after that up through July of 2016 when she was injured. In addition to the training cruises, Ms. Fitch went on incidental cruises taken by the Training Ship for refueling and repairs.

### 1. Time in Service of the Training Ship's Cruises

The parties have stipulated that Ms. Fitch participated in the following cruises:

- 2009 summer cruise, which lasted 60 days.
- 2010 summer cruise, which lasted 60 days.
- 2011 summer cruise, which lasted 61 days.
- 2012 summer cruise, which lasted 60 days.
- 2013 summer cruise, which lasted 62 days.
- 2014 summer cruise, which lasted 69 days.
- 2015 winter cruise, which lasted 15 days.
- 2015 summer cruise, which lasted 90 days.
- 2015/2016 winter cruise, which lasted 24 days.
- 2016 summer cruise, which lasted 90 days. Ms. Fitch was injured and evacuated from the Training Ship on the 72nd day of the cruise.

The parties agree that the total hours that Ms. Fitch clocked while at sea on these cruises is 4,628.56 hours. Sodexo Post-Trial Br. 15; MMA Post-Trial Br. 10; Fitch Post-Trial Br. 18 (ECF No. 169).

### 2. Ship Preparation Time

In addition to the hours she spent at sea, Ms. Fitch spent time preparing the ship to go to sea. For the summer cruises, the Sodexo crew would be preparing to serve 900 meals per day for between 60 and 90 days on the Training Ship. Between one and two weeks ahead of each cruise, Sodexo employees were assigned to prepare

the ship. The work included: wiping and cleaning counters, cleaning cupboards, wiping down walls, cleaning coolers, washing and restocking all dishes, cleaning the storerooms, doing laundry, deep-cleaning the eight berthing rooms used by Sodexo employees, and receiving and stowing the items necessary for the journey.

Ms. Fitch testified that she generally would spend all or part of the week prior to each cruise preparing the ship. She indicated that she would often move her belongings on board and live on the ship in the days before departure because there was so much to do. Ms. Fitch often worked long days to complete all her duties particularly before the summer cruises because there was also much work to be done for graduation festivities. Ms. Fitch conceded that she spent more time in some years than others to prepare for the cruises. To estimate her preparation time, she indicated that she averaged her time across the entire period of her employment because she thought that it was a fair way to account for the time.

Different general managers prepared for cruises differently. Mr. Char, who was general manager during the 2009 and 2010 training cruises, used fewer employees to prepare the ship than other general managers. Mr. Char assigned Ms. Fitch, who was then working in the capacity of a third cook, as one of the employees he sent to prepare the ship.

Alana Dahler became general manager in 2011 and participated in the 2011, 2012, and 2013 summer cruises. Ms. Dahler estimated that it took 500 to 600 hours to prepare the ship for departure. Ms. Dahler used Ms. Fitch as a supervisor/manager in that process. Ms Dahler testified that Ms. Fitch spent 80 hours over a week and a

half to prepare the ship for each cruise and that she often worked long days to prepare the ship and to complete her other assigned tasks during the busy graduation week that preceded the summer cruise.

In October of 2013, Phil Cotoni became the general manager, and he continues in that role to this day. Mr. Cotoni oversaw the 2014, 2015, and 2016 summer cruises and the 2015 and 2016 winter cruises, but he was less involved in the Training Ship than the other general managers. Mr. Cotoni never went on a training cruise, and he relied on Mark Strang, an executive chef hired in 2014, to oversee operations on the Training Ship. Ms. Fitch said that both Mr. Cotoni and Mr. Strang would assign her to do jobs to prepare the ship. Mr. Cotoni acknowledged that Ms. Fitch did some preparation work before each cruise, but he testified that Ms. Fitch did not spend seven days preparing for a cruise under his watch. Mr. Cotoni, who promoted Ms. Fitch to the position of first cook in 2014 and then to the position of lead cook in 2016, felt that Ms. Fitch's time was better spent preparing and cooking for graduation ceremonies than cleaning the ship.

Mr. Cotoni testified that it would take a maximum of 60 total employee hours to prepare the ship for a cruise, and he indicated that those hours would be reflected in color-coded schedules that he kept. When shown the schedules, however, Mr. Cotoni conceded that they did not accurately reflect preparation time. Sodexo Ex. 7.[5]

---

[5] The schedules were not produced in discovery, but they were retrieved during trial from Mr. Cotoni's old laptop. After seeing the schedules at trial, Mr. Cotoni explained that his color-coding system evolved over time and that the schedules were not what he remembered them to be. He also testified that he was often rushed in posting the schedules and that the actual hours worked might not have been the hours that employees were scheduled to work. Given the problems with the schedules, I give them no weight.

Sodexo installed a timeclock on the Training Ship on the first day of the 2014 summer cruise to keep employees accountable and to provide data showing how much employee time was spent on the ship as opposed to on the Hill. Sodexo introduced the time cards into evidence in an attempt to prove that Ms. Fitch did not spend as much time preparing the ship as she claimed, but the timecards are of little value given the testimony of Ms. Fitch and Ginny Bennett that employees who started their day by punching in at the Hill did not necessarily punch in again when they went down to work on the ship.[6] Joint Ex. 16.

MMA and Sodexo also offered the MMA quarterdeck logs and visitor security logs in an attempt to show that Ms. Fitch was not on the ship as much as she claimed during the preparation period. Joint Exs. 21, 22; MMA Exs. 1–3. Ms. Fitch testified that the students who were responsible for keeping the logs often waived Sodexo employees aboard without requiring them to sign in. Ms. Dahler confirmed that Sodexo employees were often not tracked in the logs. There are dates missing from the quarterdeck and visitor logs and known inaccuracies.[7] Given their unreliability, I assign no weight to the logs.

MMA and Sodexo urge me to find that Ms. Fitch spent no more than 30 hours preparing for each cruise by extrapolating from Mr. Cotoni's testimony that it took

---

[6]     Further, the time cards did not cover the preparation time for the 2014 cruise and there are no time cards for either of the winter cruises.

[7]     There are no visitor logs before 2014. No visitor logs are available for any date in April or early May of 2015, when Sodexo personnel would have been preparing the Training Ship for the summer cruise. In 2016, visitor logs are missing for May 2 and May 6. The quarterdeck logs only cover October of 2014 through April of 2015. The quarterdeck logs do not indicate that Ms. Fitch ever boarded the ship prior to the 2015 winter cruise, although the parties agree that she was on board that cruise.

no more than 60 total employee hours to prepare the ship. Sodexo Post-Trial Br. 15-16; MMA Post-Trial Br. 10. I reject this proposed finding[8] for several reasons: First, Mr. Cotoni had no first-hand knowledge of the time Ms. Fitch spent preparing the ship before he became general manager. Even for the years he served as general manager, Mr. Cotoni was not particularly knowledgeable about the work that went into preparing the ship. He never personally went on a cruise, and he relied on Mark Strang to manage the work onboard the Training Ship.

I credit Ms. Fitch's testimony that she spent a considerable amount of time preparing the ship when she worked for both Ms. Dahler and Mr. Char. Ms. Dahler, who actually participated in cruises, testified that it took between 500–600 employee hours to prepare the vessel. I find no reason to discredit Ms. Dahler's testimony that Ms. Fitch spent 80 hours to prepare for each cruise under her watch. I also find that Ms. Fitch would have spent a similar amount of preparation time for the cruises under Mr. Char's oversight, given that he used fewer employees to complete the preparation work.

I find that Ms. Fitch spent less time preparing the ship for cruises when she worked under Mr. Cotoni. Mr. Cotoni had a different view about the amount of work needed to prepare the ship, and he felt Ms. Fitch's skills were better utilized preparing for graduation events. I find that Ms. Fitch spent closer to 20 hours preparing the Training Ship under Mr. Cotoni's watch.

---

[8]     Remarkably, Ms. Fitch's counsel proposes that I find that Ms. Fitch worked only 24 hours in advance of each cruise. Because this proposed finding is not supported by the evidence, I reject it as well.

Accordingly, I find that Ms. Fitch spent 80 hours in preparation for each of the 2009, 2010, 2011, 2012, and 2013 summer cruises for a total of 400 hours. I find that Ms. Fitch spent 20 hours in preparation for each of the 2014, 2015, and 2016 summer cruises and the 2015 and 2016 winter cruises for a total of 100 hours. Finally, as suggested by MMA and Sodexo, I add an additional 70 hours for the time Ms. Fitch spent preparing the Training Ship to deploy after Hurricane Sandy. I find that Ms. Fitch spent 570 hours preparing the Training Ship during her years of service.

### 3. Cleaning After Return

Ms. Fitch estimated that she spent two days cleaning the Training Ship after each cruise. Ms. Dahler confirmed that Sodexo was required to clean the ship when it returned to port. Both Ms. Dahler and Mr. Cotoni indicated that the clean-up began on the last day of the cruise and occasionally extended to the next day as well.

Mr. Cotoni, who was the witness responsible for tallying Ms. Fitch's hours during the cruises, testified that he counted all hours that Ms. Fitch worked during the week the Training Ship returned even where the cruise returned early in the week, as it often did.[9] The Sodexo workweek runs from Friday through Thursday. Accordingly, any additional hours Ms. Fitch spent cleaning after the cruise ended would have been captured for any cruise that returned by Wednesday. The 2009, 2010, and 2012 summer cruises returned on a Monday; the 2011 summer cruise

---

[9] I do not agree with the contention of Sodexo and MMA that Ms. Fitch's ship time was overcounted because Mr. Cotoni included the entire week's hours for the week the ship returned. Sodexo Post-Trial Brief 14 (ECF No. 167); MMA Post-Trial Brief 9 (ECF No. 168). Ms. Fitch testified that after the summer cruises she took vacation time. Accordingly, any hours that she worked during the last week of the cruise were likely hours spent cleaning up the ship and not hours spent back on the Hill, where school was not yet back in session.

returned on a Tuesday; and the 2013, 2014, and 2015 summer cruises returned on a Wednesday. Only the 2015 and 2016 winter cruises returned on a Thursday. I credit Ms. Fitch with a total of 8 hours of clean-up time for each of the winter cruises for a total of 16 hours.

### 4. Additional Trips

I credit Ms. Fitch's testimony that she spent five days taking the vessel to New York for a fuel trip in 2011[10] and that she spent 14 days accompanying the Training Ship to Boston for repairs in 2012. Pursuant to the suggestion of MMA and Sodexo, I add an additional 300 hours for these trips. Sodexo Post-Trial Br. 16; MMA Post-Trial Br. 11.

### 5. Calculation

Ms. Fitch spent a total of 5,514.56 hours in service of the Training Ship during her tenure with Sodexo. To arrive at this figure, I supplement the 4,628.56 hours clocked on board the ship with 570 hours spent preparing the ship to embark, 16 hours spent cleaning the Training Ship after it returned from the winter cruises, and 300 hours for the Boston and New York trips.

### 6. Percentage of Hours Spent In Service of Training Ship

Having determined the amount of time that Ms. Fitch spent in service of the Training Ship, I now consider the relevant period of Ms. Fitch's employment from which the seatime percentage is calculated. MMA and Sodexo contend that I should

---

[10]     Captain Eadie testified that he did not recall this fuel trip and that he would have to check his logbook to see if it occurred. The parties did not seek to admit the logbook or otherwise introduce evidence that the fuel trip did not occur, and I, therefore, credit Ms. Fitch's testimony that there was a five-day fuel trip in 2011.

use her entire term of employment beginning in April of 2008 through the end of her employment—a period of 18,534.58 hours. Given my finding that Ms. Fitch spent 5,514.56 hours in service of the Training Ship, using the entire period of her employment would mean she spent 29.8 percent of her time in service of the vessel. Ms. Fitch argues that I should use the period of time beginning from her first cruise in May of 2009 until the end of her employment—a period of 16,332.45 hours—which would mean that Ms. Fitch spent 33.8 percent of her time in service of the Training Ship.

## C.    Conclusions of Law

I conclude that Ms. Fitch comes close enough to the *Chandris* thirty percent "rule of thumb" even using her full term of employment. *See Chandris*, 515 U.S. at 371. For one, the hours Ms. Fitch spent in service of the ship is necessarily an estimate.[11] Although the parties examine timesheets down to the one-hundredth of an hour, the Supreme Court demands no such precision:

> Generally, the Fifth Circuit seems to have identified an *appropriate rule of thumb* for the *ordinary* case: A worker who spends less than *about* 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as *no more than a guideline* established by years of experience, and *departure from it will certainly be justified in appropriate cases.*

---

[11]    I would note that my final figure does not count every hour Ms. Fitch spent in service of the Training Ship. For example, Ms. Fitch testified that before the 2014 summer cruise, when Mr. Cotoni and Mr. Strang were both new to Sodexo, she and others met weekly beginning in January to help Mr. Cotoni and Mr. Strang with the logistics necessary to prepare 900 meals a day at sea for the upcoming 69-day summer cruise.

*Id.* (emphasis added).[12]

Further, the *Chandris* thirty percent rule is for the "ordinary case." *Id.* This is not an ordinary case because the Training Ship is not an ordinary vessel. In contrast to a cargo ship that is underway most of the year, the Training Ship leaves port only once or twice per year. Ms. Fitch was on board the Training Ship as its cook every time it embarked on a voyage for a period of seven years, each time exposing herself to the perils of the sea. She crossed the Atlantic onboard the Training Ship ten times. She has established a connection to the Training Ship that is "substantial in terms of both its duration and its nature." *Id.* at 368.[13] Accordingly, I conclude that Ms. Fitch was a seaman for purposes of the Jones Act.[14]

## II.    Jones Act Employer

Having found that Ms. Fitch is a seaman, I must now decide whether Sodexo or MMA served as her Jones Act employer.

### A.    General Legal Background

An employer-employee relationship is necessary for recovery under the Jones Act. 46 U.S.C. § 30104 ("[S]eaman injured in the course of employment . . . may elect

---

[12]    Given my finding, I do not address the Plaintiff's argument that she should be credited with all of her time at sea rather than just the hours she spent working in the galley. Fitch Post-Trial Br. 7–9.

[13]    I find *Dorr v. Maine Maritime Academy* to be distinguishable. 670 A.2d 930, 934 (Me. 1996). Dorr was the Chief Engineer of a research vessel who spent only 25 percent of his time at sea over a period of six months before he was injured. The ship on which Dorr served made occasional day trips but rarely stayed out of port overnight. In contrast, Ms. Fitch comes much closer to the 30 percent guideline, and she lived on the vessel for months at a time over the course of seven years.

[14]    Given my finding, I need not decide whether Sodexo is estopped from arguing that Ms. Fitch is not a Jones Act seaman.

to bring a civil action at law . . . against the employer."). In *Cosmopolitan Shipping Co. v. McAllister*,[15] the Supreme Court stated in dicta that there is "no doubt that under the Jones Act only one person, firm, or corporation can be sued as employer." 337 U.S. 783, 791 (1949).

Ms. Fitch cites *Kukias v. Chandris Lines, Inc.*, 839 F.2d 860, 862 (1st Cir. 1988) for the proposition that "[t]he First Circuit recognizes the dual employer doctrine." Fitch Post-Trial Br. 20. *Kukias* involved a choice-of-law question, and the First Circuit did not answer the question of whether a seaman can have more than one employer under the Jones Act. *Kukias*, 839 F.2d at 862 (recognizing the possibility that ship operator could be Jones Act employer and that ship owner could be Jones Act employer under borrowed servant principles but not explicitly stating that a seaman can have more than one employer at the same time under the Jones Act). Ms. Fitch does not deal at all with the plain language of *Cosmopolitan*, but she does cite *Spinks v. Chevron Oil Co.*, which suggests, in dicta, that *Cosmopolitan* could be limited as dicta. 507 F.2d 216, 225 (5th Cir. 1975) (seaman may have more than one employer), *decision clarified*, 546 F.2d 675 (5th Cir. 1977), *and overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997). *Spinks* has been criticized by other courts. *See Glynn v. Roy Al Boat Mgmt. Corp.*, 57 F.3d 1495, 1497, 1500 (9th Cir. 1995) (stating "there can be no more than one 'employer' for purposes of the Jones Act" and citing cases rejecting *Spinks*), *abrogated on other*

---

[15]     In *Cosmopolitan*, the Supreme Court faced the question of who, as between the United States as shipowner and Cosmopolitan as the general agent, was the employer of the injured seaman. *Cosmopolitan Shipping Co. v. McAllister,* 337 U.S. 783, 791 (1949).

*grounds by Atl. Sounding Co. v. Townsend*, 557 U.S. 404 (2009). While the court in *Spinks* makes an interesting argument as to why more than one employer could be held liable under the Jones Act,[16] the Plaintiff does nothing to develop this argument and does not return to it in her Reply. As such, I consider this argument to be waived. *Graham v. United States,* 753 F. Supp. 994, 1000 (D. Me. 1990)("It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived.") (citation and internal quotation marks omitted).

It has long been recognized that a Jones Act employer does not necessarily have to be the shipowner or ship operator and that an independent contractor can be a Jones Act employer. *Guidry v. S. La. Contractors, Inc.*, 614 F.2d 447, 452 (5th Cir. 1980) ("Jones Act claim . . . requires proof of an employment relationship either with the owner of the vessel or with some other employer who assigns the worker to a task creating a vessel connection."); *Mahramas v. Am. Exp. Isbrandtsen Lines, Inc.*, 475 F.2d 165, 171 (2d Cir. 1973) (Jones Act employer of plaintiff hairdresser who claimed injury aboard ship was beauty shop concessionaire that was independent contractor of cruise line).

A third party who borrows a worker may become the Jones Act employer if the borrowing employer assumes sufficient control over the worker. *Guidry,* 614 F.2d at

---

[16]    The *Spinks* court points out that the Jones Act incorporates standards established by the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60—a point recently reiterated by the Supreme Court in *Dutra*—and suggests that more than one employer can be liable under FELA. *See The Dutra Grp.*, 139 S. Ct. at 2284–85; *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 225 (5th Cir. 1975); *see also Kelley v. S. Pac. Co.*, 419 U.S. 318, 324 (1974) (under FELA employee could be "deemed to be acting for two masters simultaneously.").

452; *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 178 (5th Cir. 1981) ("The borrowed servant doctrine is the functional rule that places the risk of a worker's injury on his actual rather than his nominal employer. It permits the injured worker to recover from the company that was actually directing his work.").

The First Circuit considered the borrowed servant doctrine in *Raymond v. I/S Caribia.* 626 F.2d 203, 205 (1st Cir. 1980). Although the facts of *Raymond* are distinguishable, the case sets forth the test for determining whether an employee is a borrowed servant. Borrowed servant status must be established by evidence such as control or direction of the seaman's work by the borrowing employer, direct or indirect payment of the seaman's wages by the borrowing employer, and an employment relationship between the seaman and the borrowing employer. *Id.*[17] Control is the critical component. *Id.* ("The prime requisite for invoking the borrowed servant doctrine is some sort of control by the borrower over the loaned employee(s).") (citing *Standard Oil Co. v. Anderson,* 212 U.S. 215 (1909)).

In order to determine Ms. Fitch's Jones Act employer, I must look to the venture as a whole and interpret any contractual language and labels in light of the actual operations. *See Cosmopolitan*, 337 U.S. at 795. At bottom, the determination

---

[17]    Courts in the Fifth Circuit follow a more elaborate formula in analyzing whether an employee is a borrowed servant. They ask the following nine questions. First, who had control over the seaman's work? Second, whose work was being performed? Third, was there an agreement between the original and the borrowing employer? Fourth, did the employee acquiesce to be employed by the borrowing employer? Fifth, who furnished the tools and place of employment? Sixth, did the original employer terminate his relationship with the employee? Seventh, was the new employment over a considerable length of time? Eighth, who had the right to discharge the employee? And ninth, who had the obligation to pay the employee? *See, e.g., In re Weeks Marine, Inc.*, 88 F. Supp. 3d 593 (M.D. La. 2015) (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969)).

of whether an employee is a borrowed servant is highly fact-specific. *Compare Hebert v. Cal. Oil Co.*, 280 F. Supp. 754, 760 (W.D. La. 1967) (in dicta, under borrowed servant doctrine, shipowner was Jones Act employer of galley hand hired by independent food service contractor), *with Sims v. Marine Catering Serv., Inc.*, 217 F. Supp. 511, 517 (E.D. La. 1963) (independent catering contractor was Jones Act employer of galley hand hired by contractor).

## B.     Findings of Fact

### 1.     The Terms of the Contracts

#### a.     Ms. Fitch's Employment Contract with Sodexo

When Sodexo hired Ms. Fitch in 2008, general manager Omar Char told Ms. Fitch that she could be deployed for 60 days on the Training Ship's summer cruises and that if she was asked to go on a cruise, she would have to go. A collective bargaining agreement (CBA) governed the relationship between Sodexo and its non-management employees, including Ms. Fitch. The CBA defined the workweek, spelled out the grievance process, and listed rates and benefits. Although the CBA was not admitted into evidence, there was testimony that, under the terms of the CBA, Ms. Fitch could be required to participate in a cruise if asked to do so.

#### b.     The Management Agreement between Sodexo and MMA

As between Sodexo and MMA, there was a Management Agreement that set forth "the terms and conditions upon which [MMA] retain[ed] Sodexo to manage and operate Food Service" for MMA. Joint Ex. 18 at § 1.1. In addition to food service on campus, Sodexo agreed to provide food service on board the Training Ship for MMA's

summer cruises and during periods when the Training Ship is "underway to the shipyard." Joint Ex. 18 at §§ 2.4, 2.8, 4.5.

The Management Agreement indicates that "Sodexo shall be an independent contractor and shall retain control over its employees and agents." Joint Ex. 18 at § 1.2. The Management Agreement further provides that "[a]ll nonmanagement Food Service employees shall be Sodexo employees, except for [MMA's Student Employees and Work Study Employees]." Joint Ex. 18 at § 5.2. It further requires Sodexo to "provide management employees to supervise all Food Service employees." Joint Ex. 18 at § 5.1.

The Management Agreement contains a provision on Personnel Obligations, which states:

> Each party hereto shall be solely responsible for all personnel actions and all claims arising out of injuries occurring on the job regarding employees on its respective payroll. Each party shall withhold all applicable federal, state and local employment taxes and payroll insurance with respect to its employees, insurance premiums, contributions to benefit and deferred compensation plans, licensing fees and worker's compensation costs and shall file all required documents and forms.

Joint Ex. 18 at § 5.5.

### c. The Shipping Articles between MMA and Ms. Fitch

When Ms. Fitch participated in a cruise, she was required to sign the Shipping Articles, which provided:

> The said crew agree . . . to be obedient to the lawful commands of [Captain Eadie] . . . and [Captain Eadie] agrees to pay to the said crew, as wages, the sums against their names respectively expressed.

Joint Ex. 9. In the portion of the Articles bearing Ms. Fitch's signature under the heading "WAGES PER MONTH", the form states "As Per Contract." Joint Ex. 9.

### 2. Actual Operations

Sodexo was responsible for choosing the employees who went on the cruise and scheduling those employees for shifts on the Training Ship. A Sodexo supervisor served in the role of Chief Steward on the Training Ship. For the 2016 summer cruise, the Chief Steward was Sodexo's executive chef, Mark Strang. Ms. Fitch prepared and served meals under the supervision of Mr. Strang. Ms. Fitch punched a Sodexo timeclock when she began her shift on board the Training Ship. Ms. Fitch remained on Sodexo's payroll while she was serving on the Training Ship. Sodexo paid Ms. Fitch's wages based upon her recorded hours and the terms of the CBA. Sodexo paid employment taxes for Ms. Fitch. Sodexo had the right to discipline Ms. Fitch or terminate her employment in accordance with the CBA.

Before being allowed to cruise with the Training Ship, Ms. Fitch was required to meet certain MMA requirements, including: obtaining a merchant mariner credential and TWIC card, meeting physical requirements, and passing a drug screening. On board, Ms. Fitch was subject to orders from Captain Eadie and other officers and was required to attend safety trainings and follow safety protocols established by Captain Eadie. Captain Eadie and the First Mate would regularly conduct inspections of the galley. If a safety hazard was observed during an inspection, it would be called to the attention of the Sodexo employees, and they would attend to it. Captain Eadie could order Sodexo employees off the ship, but he did not have the right to terminate their employment. Ms. Fitch was also required to

supervise cadets who were assigned each day to help with meals and cadets who received kitchen duty as discipline.

## C. Conclusions of Law

Sodexo contends that MMA was Ms. Fitch's employer under the borrowed servant doctrine under the nine factors used by the Fifth Circuit. Sodexo Post-Trial Br. 19–20. MMA counters that Sodexo, as an independent contractor, was Ms. Fitch's employer under the First Circuit's iteration of the borrowed servant doctrine. MMA Post-Trial Br. 17–18. For her part, Ms. Fitch claims that both Sodexo and MMA were her employers, but that if only one can be considered an employer then it should be Sodexo. Fitch Post-Trial Br. 20–21.

I follow the First Circuit's iteration of the borrowed servant doctrine and focus on who controlled or directed Ms. Fitch's work; who paid, direct or indirectly, Ms. Fitch's wages; and whether an employment relationship existed between Ms. Fitch and MMA or Sodexo. *See Raymond*, 626 F.2d at 205.

As to the issue of control and direction, by its terms the Management Agreement provides that Sodexo is an independent contractor engaged to provide food services and that Sodexo would retain control of its employees. The Management Agreement contemplates that Sodexo will provide food service on board the Training Ship and does not contain any language that would change the status of employees who serve the Training Ship. Sodexo never terminated its relationship with Ms. Fitch, and Ms. Fitch always returned to the Hill after each of the cruises without the need to restart employment with Sodexo.

Although Ms. Fitch signed the Shipping Articles and was required to obey orders of the Training Ship's commanding officers, Captain Eadie did not control the day-to-day operations of the Sodexo galley crew. *See Mahramas,* 475 F.2d at 171 (employees of contractors engaged to provide specific service on vessel do not become borrowed servants of shipowner merely by signing ship's articles, absent shipowner's control over their work orders). There is no evidence that MMA had regular input into how, when, and what work Ms. Fitch did in terms of preparing and serving the meals. On board the Training Ship, Mark Strang, a Sodexo employee, retained direction and control over her. Sodexo retained the right to discipline and terminate Ms. Fitch for issues relating to her job performance in accordance with the CBA. While Captain Eadie could have ordered Ms. Fitch off the ship if she had violated the Training Ship's code of conduct, he did not have the right to terminate her employment with Sodexo. Regular inspections by the ship's command did not amount to significant operational control over Sodexo's galley crew. As the Court noted in *Standard Oil*, the type of collaboration "where the work furnished is part of a larger undertaking" must be distinguished from direction and control over an employee in the performance of their work. *Standard Oil Co.*, 212 U.S. at 222.

As to the question of who paid Ms. Fitch's wages, the answer is clearly Sodexo. Sodexo hired Ms. Fitch and entered a collective bargaining agreement governing her employment. Sodexo recorded Ms. Fitch's time and paid Ms. Fitch based on the hours of work that she performed.[18] Although Captain Eadie agrees in the Shipping Articles

---

[18]     Sodexo unpersuasively argues that MMA indirectly paid Ms. Fitch's wages because Mr. Strang sent payroll information to Sodexo through a ship's officer and because Sodexo considered the Training

to pay Ms. Fitch wages "as per contract," the evidence suggests that the contract referenced was the CBA between Ms. Fitch and Sodexo. MMA did not pay Ms. Fitch and did not verify her hours. *Contra Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 679 (5th Cir. 1993) (where borrowing employer verified employee's time tickets daily, factor supported borrowed servant status). MMA did not reimburse Sodexo for her wages. *Contra Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 618 (5th Cir. 1986) (where borrowing employer reimbursed payroll employer for employee's hourly rate, factor supported borrowed servant status). Although MMA certainly paid for the food services Sodexo provided, the evidence does not suggest that Sodexo merely served as a general or payroll agent for MMA.

Finally, the evidence does not establish that an employment relationship existed between Ms. Fitch and MMA. MMA did not hire Ms. Fitch, and it did not control whom Sodexo sent on the cruises. The mere act of signing a vessel's articles does not make a seaman the employee of the shipowner or the master. *Mahramas*, 475 F.2d at 171. Apart from the general authority given to the master of all ships to maintain order and ensure safety, MMA did not involve itself in Ms. Fitch's work.[19]

---

Ship to be a separate profit center from the Hill. But Mr. Strang passed his payroll spreadsheet through the ship's command because he could not send attachments from his email aboard the ship. And Mr. Cotoni's testimony that Sodexo viewed the Training Ship as a separate profit center was undercut by his own inability to account for how much time Ms. Fitch spent on the Training Ship. Even if it were true that Sodexo saw the Training Ship as a separate profit center, that does not upset the conclusion that Sodexo was the entity that paid the wages of Ms. Fitch.

[19]     The additional factors considered by the Fifth Circuit do not alter my conclusion. *See Ruiz*, 413 F.2d at 312–314. The inquiry into whose work was being performed "is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." *Standard Oil Co.,* 212 U.S. at 221–22. Ms. Fitch was performing the work that Sodexo contracted to provide, and she was directed by Sodexo supervisors in performing that work. The Management Agreement between MMA and Sodexo is inconsistent with a conclusion that Ms. Fitch was the borrowed servant of MMA. Though Ms. Fitch volunteered to serve on the Training Ship, she did not

Viewing the venture as a whole, I find that Ms. Fitch remained an employee of Sodexo even when she served aboard the Training Ship. As to Ms. Fitch's argument that both Sodexo and MMA can be considered her employer, I follow the guidance of the Supreme Court's dicta in *Cosmopolitan* that there can only be one employer under the Jones Act. Accordingly, I conclude that Sodexo was Ms. Fitch's sole Jones Act employer.

## III.    46 C.F.R § 310.9 Does Not Bar Ms. Fitch's Claims Against Sodexo

Sodexo argues that 46 C.F.R. § 310.9 bars non-federal employees who are injured onboard the Training Ship from bringing claims against any party other than the State. Ms. Fitch and MMA maintain that the regulation cannot be read to abrogate Ms. Fitch's Jones Act remedies against Sodexo.[20]

Section 310 details "Regulations and Minimum Standards for State, Territorial or Regional Maritime Academies and Colleges." Section 310.9 governs "Medical attention and injury claims" and provides:

> (c) Medical care and compensation for Officers and other personnel. Officers and other personnel of the School, and of the Training Ship may avail themselves of any medical facilities furnished by the State or Federal Government for which they qualify. See, for example, 42 CFR part 32. Such persons who are not Federal employees shall look to the State alone for pay, allowances, compensation and other benefits during injury or illness.

---

acquiesce to serve as an employee of MMA. She was aware that she remained on Sodexo's payroll. The only factor that supports a finding of borrowed servant status is that MMA provided the tools and place of employment. Given the weight of the other factors, that is too little for me to conclude that Ms. Fitch was MMA's borrowed servant.

[20]    The United States also weighs in, denying that 46 C.F.R. § 310.9 limits Jones Act claims. U.S. Reply (ECF No. 170). The United States suggests that the regulation addresses duty to pay compensatory damages as between the Maritime Administration and state maritime academies in cases where an injured party has established the right to recover.

46 C.F.R. § 310.9(c). The plain language of § 310.9 does not address the ability of an injured seaman to bring a Jones Act claim against her private employer. Ms. Fitch's claims against Sodexo are accordingly not barred by the regulation.

## CONCLUSION

For the reasons stated above, I find that Ms. Fitch is a Jones Act seaman and that Sodexo is her employer under the Jones Act.


SO ORDERED.

/s/ Nancy Torresen_____
United States District Judge

Dated this 18th day of September, 2019.